## Samuel Hall, Executor, etc., et al., v. Elizabeth Hall, et al.

### Gen. No. 4,454.

1. GIFT—*evidence held to establish.* Held, from the particular evidence in this case, that a voluntary gift was established.

2. WITNESS—*when incompetent.* A party in interest is not competent in his own behalf as to any fact or transaction occurring in the lifetime of a deceased relative where the representative of such deceased is the adverse party; nor is such a party competent as against minor heirs or adult heirs not present at the time of the occurrence of any such facts or transactions.

Bill in equity. Appeal from the Circuit Court of Stark County; the Hon. LESLIE D. PUTERBAUGH, Judge, presiding. Heard in this court at the October term, 1904. Affirmed. Opinion filed March 8, 1905.

JAMES H. RENNICK and WINSLOW EVANS, for appellants.

B. F. THOMPSON and ARTHUR KEITHLEY, for appellees.

MR. JUSTICE DIBELL delivered the opinion of the court.

On October 1, 1901, William Hall delivered into the hands of his niece, Jane Ann Hall, thirteen certificates of deposit, issued by the Bradford Exchange Bank of Bradford, Stark county, Illinois, the principal of which certificates amounted to $21,800, and upon which there was certain accrued interest unpaid at four per cent. per annum. These certificates were payable to the order of William Hall, and were each by him indorsed in blank before such delivery. On the next day, October 2, 1901, Jane Ann Hall surrendered these certificates to the bank, and caused the bank to issue a certificate for $21,800, payable in one year to the order of herself and her sister, Elizabeth Hall, and her brother, Joseph Hall, with interest at four per cent. per annum, which certificate she left in the custody of the bank. The interest due that day was paid to William Hall; either to him personally then, or to him or some one for him, on that or a later date. Jane Ann, Elizabeth and Joseph were nieces and a nephew of William Hall, and lived in his home. On October 2, 1902, the bank paid William Hall the interest on that certificate for one year, and his brother Samuel, by his direction, signed his name to a receipt therefor. At the time of the payment of said interest the bank issued a new certificate for the same amount, and of like terms, in lieu of that certificate, and retained the new certificate in its custody, and it still remains in the custody of the bank. William Hall collected the interest due thereon on October 2, 1903, and the principal of said certificate still remains in the bank, except that the bank has paid taxes thereon, to the amount of $320.10. Rosa L. Thompson is the owner of the Bradford Exchange Bank, and Robert Thompson, her husband, is the cashier. Jane Ann Hall died intestate, near Bradford, in March, 1902. Prior to the commencement of this suit, said Robert Thompson was appointed administrator of her estate.

On June 25, 1903, William Hall filed in the court below a
bill in equity against said Elizabeth Hall and Joseph Hall,
and against the administrator and heirs at law of Jane
Ann Hall, deceased, and against said Rosa L. Thompson as
the Bradford Exchange Bank, and against Robert Thomp-
son.   Among said heirs at law of Jane Ann Hall was one
Ruth Hall, who had died before said bill was filed, and by
an amendment her heirs at law were made parties defend-
ant.   On February 16, 1904, the bill was amended, by
striking out material portions thereof and substituting
other allegations in their place.   The bill, as amended, re-
cited much of the early family history of William Hall,
and the circumstances under which Jane Ann, Elizabeth and
Joseph Hall became members of his household, and charged
that they confederated together to defraud him of a large
sum of money and of property of great value, and that in
pursuance of that design said Jane Ann and Elizabeth
agreed to remain with complainant and care for him during
the remainder of his life; that he was old and infirm in
body, his hearing much impaired, and he was incapacitated
from properly attending to business by reason of his age;
and that taking advantage of his infirmities, they fraudu-
lently procured him to convey real restate to Jane Ann
Hall, under an oral agreement that he should have the in-
come of the land as long as he lived, which promise has
been disregarded since her death by land being sold at par-
tition sale, with no reservation of the income thereof to
complainant; and that having perfect confidence in Jane
Ann and Elizabeth, he selected the thirteen certificates
above referred to, and handed them to Jane Ann, and di-
rected her to take them to the bank, with the understanding
and agreement with said Jane Ann and Elizabeth that they
should have said sum at his death, provided they stayed with
him and waited upon and cared for him as long as he lived,
and with the further agreement that he should have the
interest thereon during his lifetime; that previous to that
time, he had given Jane Ann 160 acres of land, worth
$10,000, being the real estate above referred to, and had

given Elizabeth Hall $6,000, and had given Joseph Hall $500. The bill further averred that after he handed said certificates to Jane Ann, with directions to take the same to the bank, Jane Ann and Joseph, her brother, on October 2, 1901, went to the bank, and wrongfully, and in fraud of complainant's rights, and without his knowledge or authority, caused a certificate to be issued by the bank for the sum of $21,800, payable, both principal and interest, to Jane Ann Hall, Elizabeth Hall and Joseph Hall, and left said certificate with the bank and under its control; that on October 2, 1902, the bank paid complainant the interest, but refused to pay him the principal, or pay him five per cent. for the ensuing year, and he then, for the first time, learned that the certificate had been issued payable to said Jane Ann Hall, Elizabeth Hall and Joseph Hall; and that the bank, on that day, of its own motion, canceled said certificate, and issued a new certificate for said sum, dated October 2, 1902, payable one year from date, with interest at four per cent., and made it payable to Jane Ann Hall, Elizabeth Hall and Joseph Hall, which said certificate continued in the custody and control of the bank, and was delivered to no one; and that on October 2, 1903, the bank paid complainant the interest accrued thereon. The bill further charged that in March, 1902, said Jane Ann Hall and Elizabeth Hall left the home of complainant, of their own free will, and without his consent, and without his fault, and refused to remain with, live with and care for him, and have ever since neglected and refused to live with and care for him, as agreed and provided they should do for said $21,800, and that thereby the complainant became entitled to rescind such arrangement, agreement and understanding. The bill further averred that this was all done in fraud of complainant, in pursuance of an original fraudulent design to obtain said money fraudulently from complainant; that after Jane Ann and Elizabeth left him, he demanded the return of said money deposited in the bank, but the bank refused to return it to him, and retained the same. The bill prayed that the contract and agreement

whereby said money was to be paid to Jane Ann Hall and
Elizabeth Hall, or to them and Joseph Hall, might be re-
scinded and declared null and void, and the outstanding
certificate annulled and canceled, and that the bank be
decreed to repay said sum to complainant, and that Eliza-
beth Hall, Joseph Hall and the administrator and heirs of
Jane Ann Hall, deceased, be decreed to have no interest in
said property or money, or certificate of deposit.    Several
answers were filed by different defendants.    The answers
denied all confederation or purpose to defraud complain-
ant; denied that the complainant had any bodily infirmi-
ties that unfitted him to attend to his business; denied that
the conveyance of the real estate to Jane Ann was obtained
by fraud; denied that the consideration of said $21,800 was
that Jane Ann and Elizabeth, or either of them, should
remain and care for William Hall during his lifetime; and
denied that they voluntarily left his home, or refused to
live with or serve him.    The main answer further averred
that the complainant was a very wealthy man, and set up
many facts concerning the family history of the various
parties.    It alleged that he was a shrewd, far-sighted, keen
man in business affairs; that he conceived the idea of dis-
posing of part of his estate during his lifetime, and that he
conveyed various tracts of real estate to certain other neph-
ews, and gave Jane Ann Hall the real estate referred to, and
gave various relatives named various sums of money, and
gave Jane Ann Hall these certificates of $21,800, all in pur-
suance of his intent to distribute or dispose of part of his es-
tate during his lifetime; that at the time they left his home
it was because they were driven away by him; and the
answers denied that the complainant was entitled to relief.
Replications were filed, the cause was referred to a master
to take and report the proofs, with his conclusions.    He
did take and report proofs, including the depositions of
Joseph and Elizabeth Hall, taken in England.    He re-
ported his conclusions at length, that the complainant
was entitled to a cancellation of the certificate, and a return
of the fund.    The chancellor sustained exceptions to this

Hall v. Hall.

report, and entered a decree dismissing the bill for want of equity. Complainant appealed to this court from that decree. After his appeal was perfected he died, and the executors of his last will were substituted as appellants in this court.

William Hall and his various brothers and sisters were born at or near Hayfield, Derbyshire, England. Three brothers and a sister, Martha, came to the United States first; then in 1856, William and his brother Jonathan and their father and mother came to the United States and settled in the vicinity of Bradford, where they lived together, and his sister Martha also came to live with them. The old people died in a few years, and thereafter William, Jonathan and Martha lived together the remainder of their lives, and accumulated, for farmers, a large fortune. Neither of them ever married. Some ten or fifteen years ago Martha died, and afterwards Jonathan, and all of their accumulations became the sole property of William. By the death of Martha they were deprived of a housekeeper. William was averse to having strange women about the house. He had brothers with families of children living in the vicinity, and his niece Hannah Hall, a member of one such families and who had sometimes helped Martha, came to keep house for him and Jonathan, and remained after Jonathan died; but she was in poor health herself, and she had a mother whose frequent illness often took her away from William's home, so that he was dissatisfied with this housekeeping arrangement. He had, at Hayfield, in Derbyshire, a brother Joseph, with a large family of sons and daughters. James Hall, a nephew who lived near him, had been to England, and had spent one year at one time and three years at another in the family of said Joseph Hall, and, on his return to the United States, had brought with him Joseph Hall, Jr., a son of said brother, who visited for some time about Bradford, and William Hall became acquainted with him. In 1896, William Hall went to England on a visit, and spent a couple of months at the home of his brother, Joseph Hall. He then returned to

the United States, bringing with him his nieces Jane Ann
Hall and Elizabeth Hall, daughters of his brother Joseph,
and they visited about Bradford for a time, and returned
to England. The following summer he wrote, or had a
nephew write, for Jane Ann to come and keep house for
him, promising her $4 a week as wages. She came, attended
by her brother Joseph. She became William Hall's house-
keeper, and Joseph returned. Joseph Hall, Sr., and his
wife, of Hayfield, were in poor health, and the following
year they died. Apparently the only unmarried children
they left were Jane Ann, Elizabeth and Joseph, and these
were accustomed to live together. Elizabeth then wrote to
her sister Jane Ann, to know whether she and her brother
Joseph should come to the United States, or whether Jane
Ann would return to England. Jane Ann replied that their
uncle William insisted on their coming, or on Elizabeth
coming, to the United States, and to borrow what money
they needed to defray their expenses, and he would pay it.
Accordingly they sold what little household furniture they
had, and broke up their home, and borrowed what further
money was needed to defray their passage to the United
States, and came to Bradford. William made an arrange-
ment with Jane Ann and Elizabeth to pay them $3 apiece
per week, as wages, and they continued to live with and keep
house for him until March, 1902. William immediately
paid the loan they had made in England of money sufficient
to pay their passage, but Jane Ann and Elizabeth repaid
it to him, either in whole or in part, out of their wages.
Joseph also made his home with William, assisting in doing
the chores about the place, and sometimes working for
neighboring farmers, and he also made a trip back to Eng-
land while his sisters lived with their uncle William. Will-
iam Hall frequently announced that it was better to dis-
pose of his property himself, in his lifetime, as he wished
it to go, rather than to do so by will, saying that a will
might be contested, but that if property was placed in the
possession of the persons whom he wanted to have it, who
could take it from them? About the year 1899 he conveyed

to a nephew living near Bradford 600 acres of land, the exact value of which does not appear, but it seems to have been worth upwards of $75 per acre then, and much more when the evidence was taken. At or about the same time he conveyed to another nephew living near Bradford another six hundred acres of land, of as much or greater value. One of these conveyances covered the place where he had lived since 1856, and where he was still living when the evidence was taken. He seems to have collected the rents from these lands for some years, and perhaps orally reserved the right to the rents during his life. After Jane Ann, Elizabeth and Joseph became members of his family, he deeded to Jane Ann 160 acres of land worth some $11,000 or $12,000 and orally reserved the rents during his lifetime. He gave to Elizabeth certificates of deposit which, it seems to be assumed in the evidence, amounted to $6,000, although we do not recall that any witness stated the precise amount. He gave Joseph a certificate for $500 which he required to be returned to him at sometime when he had a difficulty with Joseph, and which was afterwards given to Joseph again. These matters are historical, and only indirectly bear upon the litigated questions in this case, which are whether the certificates of deposit aggregating $21,800 were delivered to Jane Ann, or to Jane Ann and Elizabeth; whether they were delivered as gifts, or pursuant to a contract to stay with and care for William during his life; if they were delivered as gifts, whether any condition was attached which made the gifts inoperative; and if they were delivered pursuant to a contract, whether the person or persons who made the contract with him violated it, and thereby lost the right to retain the certificates.

Upon these questions the testimony is very conflicting. We have studied it in the record itself, in order, as fully as possible, to ascertain which is the more worthy of credence. Without undertaking to set out the details of the testimony given by the respective witnesses, we think it sufficient to say that we are of opinion that the preponderance of the evidence establishes the following state of facts: On

October 1, 1901, William Hall called Jane Ann and Elizabeth upstairs to a room where he kept his securities, and he took out of a receptacle the thirteen certificates of deposit already referred to, counted them over, ascertained the amount, talked with his nieces about it, and made a present of them to his niece, Jane Ann Hall, who was clearly his favorite, saying that he should want the interest during his lifetime, and advising them to take the certificates to the bank. They then went downstairs, and pen and ink were obtained, and he wrote his name on the back of each, and delivered them to Jane Ann. The next day Jane Ann and her brother Joseph went together to Bradford, and went into the bank. We conclude the fact is that William also came into the bank very soon thereafter, though William denied it. Elizabeth testified that William did not go to Bradford with Jane Ann and Joseph, and the testimony of Joseph seemed to indicate that William was not present there that day. But Elizabeth and Joseph testified in England, upon written interrogatories previously prepared, and it was not therefore possible to call their attention as distinctly and definitely to this subject as could have been done on oral examination before the master. We think, however, that the testimony of Robert and Rosa L. Thompson establishes the presence of William in the bank with Jane Ann and Joseph that day. We think the proof establishes that Jane Ann, after receiving the certificates the day before, had conferred with her sister, and had determined that this gift from her uncle should be equally divided between herself and her brother and sister. In the presence of Jane Ann, Joseph and William, the bank was directed to figure up the interest due to that date, and did so figure, and the interest was then paid to William. Jane Ann then directed a new certificate to be issued for the whole amount, payable to herself and her sister Elizabeth and her brother Joseph, and such certificate was discussed in the presence of William, commented upon by him, prepared by the bank, payable in one year, with interest at four per cent. and handed to William Hall, who in turn

handed it to Jane Ann.  It was there agreed among them
that the certificate should remain in the custody of the bank,
and that William should receive the interest during his life,
and out of it pay the taxes on the money.  The certificate
was then placed in an envelope, properly indorsed on the
back, and placed in the bank's vaults, where its successor
still remains.  William Hall drew the interest on October
2, 1902, and on October 2, 1903, and did not, at either of
said times, claim that he owned the money, or question the
title of Elizabeth and Joseph and the administrator and
heirs at law of Jane Ann to the principal fund, though they
had all left his home and Jane Ann had died more than six
months before he received the first of these interest pay-
ments.  The proof does not show how much property Will-
iam Hall retained after making this last gift to his niece
Jane Ann.  The facts were peculiarly in the possession of
William Hall.  He introduced no evidence tending to show
that by this gift he had impoverished himself, nor indeed
did the bill so charge.  Defendants proved that at the time
that this transfer was made, he had on deposit in that
bank at least $40,000, and perhaps nearer $80,000, all on
interest-bearing certificates of deposit, of various dates and
amounts.  Complainant did not attempt to rebut, deny or
qualify this testimony.  The proof also tended to show
that he had financial dealings with another bank in Brad-
ford, and that he was in the habit of loaning money about
the country.  While the proof showed that William was
hard of hearing, that his Derbyshire dialect was very
broken and not easily understood by Yankee strangers, that
he had some impediment in his speech, that he had been
able to write in early life, but had discontinued the prac-
tice so long that he could only write his name, and could
not read writing, except to read names and amounts of
principal and interest in his certificates and other papers,
yet the proof makes it obvious that he was a keen and
shrewd business man, and not liable to be deceived or de-
frauded in a business transaction by any one.  We think
the proof shows that Jane Ann and Elizabeth were not

willing to live without their brother, and that Joseph was
not particularly welcome in William's household.   Will-
iam had that mixture of generosity and closeness often
found in a rich man who has accumulated his property by
hard work from small beginnings.   While he was so gen-
erous to these nieces, still he kept them on wages of $3 a
week, and carefully exacted from them a repayment of the
small loan he had furnished to pay their passage over.    It
evidently fretted him to have Joseph about the house
when there was very little work for him to do, and he felt
that Joseph was not earning his living. He could give Joseph
$500, but did not like to support him.   William had a long
sickness in the early part of 1902, during which he was cared
for very faithfully by his nieces, and especially by Jane
Ann.   On a certain morning in March, he was offended
with Joseph because, having gone to visit a relative  the
evening before, he had stayed there over night, on account
of a violent rain storm.   William, it seems, always desired
to have the members of his household at home at night, and
although Joseph was some forty-six or forty-seven years
old, yet William thought he ought not to stay out over
night, and he was angry with him upon his return.   A
quarrel ensued, as to which William gives a version which
makes Joseph appear very much to blame, while Elizabeth
and Joseph give a· version which places the blame upon
William.  As a result, William ordered Joseph to leave.  Jo-
seph declared he would not go without his sisters, and Wil-
liam said they could all go.   Joseph packed his valises and
went to an uncle's a mile or less. distant.   Jane Ann was
very much opposed to going, and was crying bitterly, and
shaking, and declaring she would not go.  She was in very
poor health.   Jane Ann and Elizabeth, during that and the
next two or three days, went back and forth between  the
home of their other  uncle where  their brother  was, and
their uncle William's, spending the nights at William's.
On the last of these days, they were at the home of  their
neighboring uncle, and Jane Ann looked so miserable that
her aunt persuaded her to stay there over night. Jane Ann

had a stroke of paralysis that night, and died a few days later. Elizabeth and Joseph did not return to their uncle William's, but stayed in Bradford a few weeks, and then returned to England with the remains of their sister Jane Ann, and they have since lived in England. If it were held, contrary, as we think, to the greater weight of evidence, that Jane Ann agreed to stay with and care for her uncle during her life, as a consideration for the $21,800, or that she and her sister agreed that they would do so, still we are of opinion that there is no preponderance of evidence that she or they broke the contract, but rather that the removal was the fault of William. We are not convinced that Jane Ann intended permanently to leave her uncle's home. During the two or three days referred to, she went back and forth between the home of her uncle William and the home of her other uncle, and only remained that night at her other uncle's house because she was so ill. Her return thereafter was prevented by a stroke of paralysis and her almost immediate death. Our conclusion upon the whole evidence is that this money was not delivered to Jane Ann or to Jane Ann and Elizabeth as a consideration for them or either of them to live with William the rest of his life and care for him, but that it was a voluntary gift by him to Jane Ann, made as a part of his intentional distribution of a large portion of his estate among such of his relatives as he desired to favor, in order to put such estate where no contest of a will could afterwards defeat the gift.

As we conclude that the placing of the new certificate in the names of Jane Ann, Elizabeth and Joseph was with the full knowledge and concurrence of William, and that the new certificate was placed in his hands, and by him again delivered to Jane Ann, and by her placed in the hands of the banker in the presence of William, with the full understanding that the bank would retain the certificate, and pay to William the interest during his life, it follows that the argument made by appellant here, that his right to the interest made the gift incomplete, is not sound. If the preponderance of the evidence established what ap-

pellant claims, that he was to have the interest for his life, and that Jane Ann, without his knowledge or consent, caused a new certificate to be issued, payable to the three, interest as well as principal, and thus put it in their power to dispose of the certificate and deprive him of the interest, there would be some force in the position that he had been wronged by the course pursued. But we are of opinion that the course pursued was exactly what he agreed to, and was entirely in harmony with his wishes. His rights have been preserved. He collected the interest each interest day thereafter until the evidence was taken, and the bank retained the certificate for his benefit as well as for the benefit of the payees.

We have thus far discussed the case as if William Hall was a competent witness in his own behalf. It is obvious that he cannot be a competent witness to any fact occurring in the lifetime of Jane Ann Hall, as against the administrator of her estate, nor as against those of her heirs at law who are minors, nor as against any of her heirs at law except Joseph and Elizabeth, and as against them as the heirs of Jane Ann only where they were present at the conversation or transactions concerning which William testified. If his evidence were eliminated from the record, the case for the complainant would have very little substantial support. We deemed it unnecessary to consider whether the one-third interest which Elizabeth and Joseph each acquired in the certificate and fund by the act of Jane Ann in causing them to be named as co-payees with her, could be severed from the interest which remained in Jane Ann, so that William could be a competent witness against them as to two-thirds of the fund, because, as already shown, we are of opinion that, even if the evidence of William be considered entirely competent, nevertheless the preponderance of the evidence does not sustain the allegations of the bill.

The decree of the court below is therefore affirmed.

*Affirmed.*